## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PILOT BANK,

     Plaintiff,

v.                                    CASE NO: 8:12-cv-347-T-26TBM

NATIONWIDE LIFE INSURANCE COMPANY,

     Defendant.

_____/

## O R D E R

Before the Court are cross-motions for summary judgment consisting of the following: (1) Defendant Nationwide Life Insurance Company's Motion for Summary Judgment (Dkt. 42), Defendant's Statement of Undisputed Facts with numerous exhibits (Dkt. 41); Plaintiff's Memorandum in Opposition (Dkt. 57) and Statement of Disputed Facts (Dkt. 58) with declarations and deposition excerpts (Dkts. 59, 60 & 61); and (2) Plaintiff Pilot Bank's Motion for Summary Judgment (Dkt. 45), Pilot Bank's Statement of Undisputed Facts with attachments (Dkt. 44) and various declarations, depositions, and responses to request for admissions (Dkts. 47, 48, 49, 50, 51, 52, 53, 54, 55 & 56), and Defendant's Response in Opposition with attachments.  (Dkt. 63).  After careful consideration of the motions, the applicable law, and the entire record, the Court concludes that Defendant's motion should be denied and Plaintiff's should be granted.

**PERTINENT FACTS**

Plaintiff is Pilot Bank, which was formerly known as Terrace Bank.[1]  Donald

Ferguson, Jr., was the president and a principal of Gold Seal Roofing and Construction,

Inc. (Gold Seal) and Rough N'Nuff, LLC (Rough N'Nuff).  Gold Seal is a roofing

company and Rough N'Nuff is the property owner where the roofing company conducts

its business.[2]  Beginning in 2003, Gold Seal borrowed money from the Bank, and gave a

life insurance policy as collateral for the loan.  In 2005, Rough N'Nuff borrowed money

from the Bank, and gave a mortgage to the Bank to secure the loan.  Both Mr. Ferguson

and Gold Seal guaranteed the Rough N'Nuff loan.

Mr. Ferguson defaulted on both the Gold Seal and Rough N'Nuff loans.  Soon

after the defaults, Mr. Ferguson also failed to make premium payments for the Policy,

resulting in the lapse and termination of the Policy.  When the Bank contacted

Nationwide after learning of Mr. Ferguson's death, Nationwide told the Bank that the

Policy had lapsed.  The Bank then filed suit against Nationwide claiming that Nationwide

had breached its contractual duty to pay the death benefit to the Bank and that Nationwide

was negligent by failing to give the notice of the pending lapse and lapse to the Bank.

The Bank seeks the full amount owed on both the Gold Seal and Rough N'Nuff loans

totalling approximately $585,961.00 exclusive of costs and attorneys' fees in this lawsuit.

---

[1]  The banks will be referred to as the Bank.

[2]  See docket 67, para. 3 (Statement of Plaintiff's case).

The Bank claims the Policy served as collateral for both loans and that Nationwide was obligated under the Policy and the Assignment to notify the Bank of any premium delinquencies.

### *The Two Loans*

On July 2, 2003, Gold Seal borrowed $75,000 from Terrace Bank.[3]  The loan was secured by Mr. Ferguson's term life insurance policy (the Policy) in the amount of $600,000.00 with Nationwide.[4]  An Assignment of Life Insurance Policy as Collateral (the Assignment) was executed the same day.[5]  Nationwide acknowledged that it timely received a copy of the Assignment.[6]  Six additional promissory notes were executed by Gold Seal to the Bank which reflect renewals and increases to the original borrowed amount: (1) March 29, 2004, in the amount of $75,000.00;[7] (2) July 14, 2004, in the

---

[3]  See docket 47-1, p. 5 of 29, para. 18 (Declaration of Kevin Buckland, Executive Vice President of Pilot Bank).

[4]  Mr. Ferguson purchased a Flexible Premium Variable Life Insurance Policy on January 17, 2003.  See docket 50-1, para. 1, Exh. A.

[5]  See docket 41-5, p. 1 of 3 (Exh. 3 to Nationwide's' Statement of Undisputed Facts).

[6]  See docket 41-5, p. 2 of 3 (Exh. 3 to Nationwide's Statement of Undisputed Facts) and docket 41-12, para. 3 (Exh. 10 to Nationwide's's Statement of Undisputed Facts).

[7]  See docket 50-1, p. 2 of 33, para. 8, Exh. E (Request for Admissions).

amount of $75,000.00;[8] (3) April 15, 2005, in the amount of $150,000.00;[9] (4) June 13, 2006, in the amount of $225,000.00;[10] (5) September 21, 2007, in the amount of $150,000.00;[11] and (6) December 4, 2008, in the amount of $137,589.60.[12]   The Gold Seal loan was in default as of November 12, 2009.[13]   The obligation including principal, interest, and attorney's fees on the loan equals $255,165.00.[14]

On May 12, 2005, Rough N'Nuff borrowed $ 253,300.00 from Pilot Bank by executing a promissory note.[15]   That same date Rough N'Nuff executed and delivered a mortgage encumbering real property in Hillsborough County, Florida, to Pilot Bank.[16] The mortgage is listed in the promissory note as collateral security for the loan.  Gold Seal and Mr. Ferguson guaranteed the Rough N'Nuff loan.[17]   The Rough N'Nuff loan

---

[8]   See docket 50-1, p. 2 of 33, para. 9, Exh. F.

[9]   See docket 50-1, p. 3 of 33, para. 10, Exh. G.

[10]   See docket 50-1, p. 3 of 33, para. 15, Exh. L.

[11]   See docket 50-1, p. 3 of 33, para. 16, Exh. M.

[12]   See docket 50-1, p. 3 of 33, para. 18, Exh. O.

[13]   See docket 47-1, p. 3 of 29, para. 12 (Declaration of Kevin Buckland, Executive Vice President of Pilot Bank).

[14]   See docket 47-1, pp. 3-4 of 29, paras. 14 & 15.

[15]   See docket 50-1, p. 3 of 33, para. 11, Exh. H (Request for Admissions).

[16]   See docket 50-1, p. 3 of 33, para. 12, Exh. I.

[17]   See docket 50-1, p. 3 of 33, paras. 13 & 14, Exhs. J & K.

was in default as of February 27, 2010.[18]  A judgment of foreclosure was entered against

the property securing the loan in November 2012, listing the amount of principal due on

the note as $214,594.[19]  As of June 2013, Pilot Bank had not succeeded in selling the

property and therefore no amount has been applied to the amount due from Rough

N'Nuff.[20]  The obligation including principal, interest, and attorney's fees on the loan

equals $330,796.00.

### *The Assignment*

The Assignment was executed by "the undersigned" which was Donald Ferguson

individually and noted that the borrower was Gold Seal.  By the terms of the Assignment,

the Policy was assigned and "all claims, options, privileges, rights, title and interest

therein and thereunder .   .   . subject to all the terms and conditions of the Policy and to

all superior liens, if any, which the insurer may have against the Policy."[21]  Subsection

B.1. of the Assignment provides that the assignee, the Bank, has "[t]he sole right to

collect from the Insurer the net proceeds of the Policy when it becomes a claim by death

---

[18]  See docket 47-1, p. 3 of 29, para. 12.

[19]  See docket 47-1, p. 3 of 29, para. 13, Exh. D.

[20]  See docket 47-1, p. 4 of 29, para. 16.

[21]  See docket 41-5, p. 1 of 3, Subsection A. of Assignment (Exh. 3 to Nationwide's' Statement of Undisputed Facts).

or maturity."[22]  The Assignment further provides in subsection D that "[t]his assignment

is made and the Policy is to be held as collateral security *for any and all present and*

*future liabilities of the above referenced Borrower* [who is Gold Seal according to the

terms of the Assignment], or any of them, to the Assignee, of every nature and kind,

whether now existing or *that may hereinafter arise in the ordinary course of business*

between any of the above referenced Borrower and the Assignee, .   .  ." (Emphasis

added).  Regarding the balance of any sums received from the Insurer remaining after

payment to the assignee, subsection E.1. provides that the balance "shall be paid by the

Assignee to the persons who would have been entitled thereto under the terms of the

Policy had this assignment not been executed."[23]  Subsection G does not require the

assignee to pay the premiums and provides as follows:

> *The Assignee shall be under no obligation to pay any*
> *premium, or the principal of or interest on any loans or*
> *advances on the Policy* whether or not obtained by the
> Assignee, or any other charges on the Policy, but any such
> amounts so paid by the Assignee from its own funds shall
> become a part of the Liabilities hereby secured, shall be due
> immediately, and shall bear interest .   .  .[24]

(Emphasis added).

---

[22]   See docket 41-5, p. 1 of 3, Subsection B.1. of Assignment (Exh. 3 to
Nationwide's Statement of Undisputed Facts).

[23]   See docket 41-5. P. 1 of 3, Subsection E.1. (Exh. 3 to Nationwide's Statement
of Undisputed Facts).

[24]   See docket 41-5, p. 1 of 3, Subsection G (Exh. 3 to Nationwide's Statement of
Undisputed Facts).

## ***The Policy***

The Policy, which was listed as the collateral securing Gold Seal's promissory

note, contains the following grace period provision in pertinent part:

> If the Cash Surrender Value on a Monthly Anniversary Day is
> not sufficient to cover the current monthly deduction, and the
> Guaranteed Policy Continuation Provision is not in effect, a
> Grace Period will be allowed for the payment of a premium of
> at least 4 times the current monthly deduction.  We will send
> you a notice at the start of the Grace Period, at your address in
> the application or another address you specify, stating the
> amount of the premium required.[25]

The "you" and "your" referred to in the Policy is the owner, which is Mr. Ferguson.[26]

The Policy contains the following provision regarding assignment of any rights:

> ASSIGNMENT:  While the Insured is living, you may assign
> any or all rights under your Policy.  We will not be bound by
> any assignment unless it is in a written form acceptable to us
> and is recorded at our Home Office. An assignment will not
> affect any payments made or actions taken by us before we
> record it.  We will not be responsible for the sufficiency or
> validity of any assignment.
> The assignment will be subject to any Indebtedness owed to
> us before it was recorded.  The interest of any Beneficiary[27]

---

[25]   See docket 50-1, p. 21 of 33 (Policy, p. 9).

[26]   See docket 50-1, p. 17 of 33 (Policy, p. 5 — "'You' or 'your' refer to the Owner of this Policy.").

[27]   A beneficiary is defined as "[t]he Beneficiary is the person to whom the Death Proceeds are paid.  The Beneficiary is named in the application, unless changed."  See docket 50-1, p. 16 of 33 (Policy, p. 4).  The provision referring to beneficiaries states in pertinent part that "[t]he Beneficiary and Contingent Beneficiary on the Policy Date are named in the application."  See docket 50-1, p. 20 of 33 (Policy p. 8).  The application lists Patricia S. Ferguson, Mr. Ferguson's wife, as the primary beneficiary, and Jennifer

will be subject to the rights of any assignee of record at our
Home Office.[28]

The parties do not assert any failure to comply with this provision.

Pilot Bank gave Nationwide notice of a change in the assignment of record on
November 10, 2009, when Terrace Bank became known as Pilot Bank.[29]  The letter
designated a post office address for purposes of the Assignment.  Nationwide
acknowledged the change to the assignment of record on November 10, 2009.[30]  The
Policy lapsed on May 17, 2010.[31]

### *Conduct of the Parties*

On May 21, 2010, Nationwide sent a letter to Mr. Ferguson as the policy owner
notifying him that the policy had lapsed because premiums were not received by the due
date stated in previous lapse notices.[32]  The letter also recognized that the grace period
(which was 61 days according to the terms of the Policy) had expired and therefore the
policy was terminated.  The letter further referred Mr. Ferguson to the reinstatement

---

Ponte, Mr. Ferguson's sister, as the contingent beneficiary.  See docket 50-1, p. 33 of 33.

[28]  See docket 50-1, p. 20 of 33 (Policy, p. 8).

[29]  See docket 47-1,p. 28 of 29 (Exh. E to Kevin Buckland's Declaration).

[30]  See docket 47-1, p. 29 of 29 (Exh. E to Kevin Buckland's Declaration).

[31]  See docket 50-1, p. 33 of 33, Exh. T.

[32]  See docket 44-5 (Exh. 5 to the Bank's Statement of Undisputed Facts).

-8-

provision, which would have allowed him to reinstate the Policy outside the grace period for up to three years.[33]

Also in May 2010, Nationwide sent a "lapse notice" to Gold Seal, as opposed to the Bank, stating that "you hold an Assignment on Life Insurance Policy N991182740."[34] The letter was sent to the incorrect entity because the assignee was the Bank, not Gold Seal, the borrower. Elaine Kelly, who worked in policy administration for Nationwide in 2010, testified that she did not know why the letter was sent to Gold Seal.[35] The letter

---

[33]   See docket 56, pp. 19-20 (Deposition of Mark Trigg).

[34]   See docket 54-1, p. 13 (Deposition of Elaine Kelly). Elaine Kelly has been employed by Nationwide for 32 years and worked in policy administration in 2010. She indicated that although the lapsed letter was dated February 4, 2008, it was likely prepared in May 2010. She testified that it was probably sent on May 24, 2010— "To me, it looks like the day that it was sent out is the date of the note [witness' note kept in course of work] which is May 24, 2010. It was a template letter. So it looks to me that I didn't change the date on the template. Human error."

[35]   See docket 54-1, pp. 11-13 (Deposition of Elaine Kelly). The following colloquy transpired:

> Q: How did it come about that you would have sent the lapse notice to the assignee in this case?
> A: On the system, we would pull up the policy information and see if there was a collateral assignment on the policy.
> Q: So it's only sent out where there's a collateral assignment; is that correct?
> A: That's correct.
> .   .   .   .
> Q: Okay. So looking at your Nationwide Document No. 1, you would have Gold Seal Roofing as the assignee?
> A: From the assignment document, that looks incorrect.
> Q: Right. Do you know if you sent a lapse notice to Gold Seal Roofing? Or did you send it to Pilot Bank?

notified the assignee that the policy had lapsed because premiums were not received by the due date.[36]

Mark Trigg, NF Operations Manager of Nationwide, avers that neither the Bank nor Mr. Ferguson ever informed Nationwide to send notifications regarding a pending lapse to anywhere other than the address of the insured as found in his application.[37] Mr. Trigg testified at deposition, however, that Nationwide has a written procedure of attempting to send notice to an assignee if the policy is in lapse pending or lapsed status.[38]

---

> A. From the letter, it looks like it went to Gold Seal Roofing.
> Q: Do you know what information you used to decide that
> Gold Seal Roofing was the assignee?
> A: It would have been information on the computer.

[36] The letter is addressed to Gold Seal and provides in pertinent part as follows:
> This letter is to notify you that this policy [N991182740] has
> lapsed.  This policy has lapsed because premiums were not
> received by Nationwide by the due date.

See docket 44-4 (Exh. 4 to the Bank's Statement of Undisputed Facts).

[37] See docket 41-2, para. 6 (Exh. 10 to Nationwides' Undisputed Statement of Facts).

[38] See docket 56-1, pp. 15-16 (Deposition of Mark Trigg):
> Q: Why is a notice sent to an assignee of a policy that a policy
> has lapsed?
> A: It is done as a customer service process.
> Q: And is there any written policy and procedure that
> Nationwide has regarding providing such notice?
> A: I believe so.
> Q: And what is that policy?
> A: That when we observe a policy in lapse pending or lapsed
> status, we attempt to send a notice to the assignee.
> Q: And why wasn't that done or why wasn't a notice sent to
> Pilot Bank in this case?

Ms. Kelly's deposition testimony seems to corroborate Mr. Trigg's testimony that
Nationwide's practice was to send at least a notice of lapsed status to assignees in that she
would send lapsed, as opposed to pending lapse, letters to assignees after the policies
lapsed and the assignee could try to reinstate the policy if desired.[39]  In this instance, the
letter she initiated was not addressed or sent to the Bank, but rather was addressed and
sent to Gold Seal.  The record is unclear as to why this notice letter was not sent to the
Bank.[40]

---

> A: I cannot answer that.
> Q: So Nationwide did not follow the policy and procedure in
> this case; is that correct, in terms of sending out a lapse
> pending or lapsed notice to Pilot Bank?
> A: It would appear so.

[39]  See docket 54-1, pp. 9-11 (Deposition of Elaine Kelly):
> Q: Well, what's the reason why you would send a letter like
> this to the assignee after the policy is lapsed?
> A: To notify them that the policy is no longer in force.
> However, to make a policy in force, you would have to go
> through underwriting.
>     .   .   .   .
> Q: So, it's your understanding, then, that one of the reasons
> for sending this letter to the assignee is to notify them that it's
> lapsed and that it's their obligation to try to get it reinstated?
> A: Yes.

[40]  A notation in Nationwide's files reflects that various departments "were all a
little confused as well why they never received a notice at the bank."  See docket 44-7
(Exh. 7 to the Bank's Statement of Undisputed Facts).  Their records show that "lapsed"
letters were sent to only Mr. Ferguson and to Gold Seal "as assignee."

With respect to the Rough N'Nuff loan, Mark Trigg of Nationwide avers that Nationwide was never made aware of the Rough N'Nuff loan until a lawsuit was filed.[41] The property used as collateral for the loan was to be used by Gold Seal for its business and was located at the same address listed as Gold Seal's address as the commercial guarantor.[42]

Mr. Ferguson died on February 6, 2011.[43]  In February 2011, Pilot Bank learned of Mr. Ferguson's death, called Nationwide, and made a death claim[44] pursuant to the Assignment.[45]  Kevin Buckland, Executive Vice President of Pilot, avers that the Bank would have paid all of the required premiums and taken all steps necessary to reinstate the Policy had it  known of the pending lapse or lapse, given that the loans to Gold Seal and Rough N'Nuff were undersecured.[46]

The Bank filed this lawsuit in Florida state circuit court.  Nationwide removed the action to this Court in February 2012 based on diversity of citizenship.[47]  The Bank in two

---

[41]  See docket 41-12, para. 5 (Exh. 10 to Nationwide's Undisputed Statement of Facts).

[42]  See docket 47-1, pp. 4-5 of 29, para. 17.

[43]  See docket 48-1 (Certificate of Death).

[44]  Nationwide's notes describe Mr. Buckland's telephone call as a death claim.

[45]  See docket 47-1, p. 2 of 29, para 6 & Exh. A.

[46]  See docket 47-1, p. 2 of 29 at para. 8.

[47]  See docket 1.

counts seeks recovery of the total indebtedness on the Gold Seal and Rough N'Nuff loans based on (1) breach of contract premised on Nationwide's failure to send notice that the premiums could not be covered by the cash surrender value of the Policy, and (2) negligence based on Nationwide's failure to notify the Bank that coverage was about to lapse or had lapsed.

## ARGUMENT

Nationwide seeks a plenary summary judgment on the complaint on the following grounds: (1) Nationwide is not obligated to pay death benefits to the Bank for the Gold Seal loan because the Bank was not entitled to notice pursuant to statute or the language of the Assignment and Policy; (2) because the Policy was never listed as collateral for the Rough N'Nuff loan, Nationwide is not liable for the Rough N'Nuff loan; and (3) the Bank has forfeited any claim for attorney's fees and costs pursuant to section 627.461, Florida Statutes. The Bank seeks summary judgment on the breach of contract claim, in particular that under the terms of the Assignment and the Policy, Nationwide was required to notify the Bank of any premium delinquencies triggering the start of a grace period. The Bank contends that Nationwide's failure to notify the Bank and provide it an opportunity to pay the premiums or to reinstate the Policy constitutes a breach of the Assignment.

## ANALYSIS

The crux of this case is (1) whether the Assignment and Policy required Nationwide to give notice to the Bank of the Policy's pending lapse and lapse so that the Bank could pay premiums to prevent termination of the Policy, and (2) whether Gold Seal's guaranty of the Rough N'Nuff loan operates as a future liability arising in the ordinary course of business between the Bank, as assignee, and Gold Seal, as the borrower, and is therefore secured by the Policy under the terms of the Assignment, making the amount of the Rough N'Nuff loan recoverable.  The Court will address each motion for summary judgment, reviewing the record, and all of its inferences, in the light most favorable to the nonmoving party.  See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### *Notice*

With respect to the notice issue, Nationwide asserts that (1) neither the terms of the Policy nor the Assignment required it to send notice to the Bank of either pending lapse or lapsed policies and (2) neither the conduct of the parties nor its general practices alters the terms of the agreements.  The Bank asserts that the Assignment and the Policy provide that Nationwide should have given notice to the Bank at the start of the grace period to permit the Bank to exercise its right to pay the premiums to prevent lapse and termination of the Policy.  A close examination of the agreements and the circumstances surrounding the transactions will determine whether the Bank was entitled to notice of the pending lapse or lapse of the Policy.

The Policy allowed for its assignment and Nationwide agreed to be bound by such assignment so long as it was recorded at its home office.  There is no dispute that the Assignment was timely recorded at the home office, and Nationwide did not object to its form.  Pursuant to the terms of the Assignment, all "claims, options, privileges, rights, title and interest therein and thereunder" the Policy were assigned to the Bank "subject to all the terms and conditions of the Policy."  Although by the terms of the Assignment the Bank was not obligated to pay the premiums, it had the option to do so.

The Policy does not contain a general notice provision; however, it bears a specific notice prerequisite that pertains to the start of a grace period when the cash surrender value of the insurance is insufficient to cover the premium.  In that instance, the Policy states that notice of the start of the grace period will be sent to "you" at the address in the application or at another address specified.  The "you" refers to the owner, who has all rights under the Policy.  The owner Mr. Ferguson, however, assigned all his rights, save a few listed instances inapplicable to this case, to the Bank.  Nationwide unquestionably knew the address of the Bank as assignee, after it acknowledged the address in November 2009, which was approximately four months before the Policy actually started to lapse, thereby triggering the grace period.  Based on the following Florida law,[48] the Court finds

---

[48]   Because removal jurisdiction in this case derives from diversity of citizenship, this Court is required to consider state-law contract claims applying the substantive law of the forum state, which is Florida.  Sphinx Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 412 F.3d 1224, 1227 (11th Cir. 2005).

that the Policy and the Assignment required Nationwide to give notice to the Bank as assignee of the pending lapse and lapse of the Policy under the grace period provision.

Both parties rely on the same cases, interpreting them differently. See Lewis State Bank v. Travelers Ins. Co., 356 So.2d 1344 (Fla.Dist.Ct.App. 1978); Massachusetts Mut. Life Ins. Co. v. Pinellas Central Bank & Trust Co., 175 So.2d 245 (Fla.Dist.Ct.App. 1965); Travelers Ins. Co. v. Tallahassee Bank & Trust Co., 133 So.2d 463 (Fla.Dist.Ct.App. 1961).[49] The differing facts and issues decided in these cases, nevertheless, establish Florida law as allowing collateral assignment of an insurance policy as a conveyance to the assignee of all the rights and liabilities the insured previously possessed under the policy, if the assignment and policy so provide.

The case of Tallahassee Bank is most instructive in setting forth the main premise concerning assignment of insurance policies as collateral securing an indebtedness. There, two policies of term life insurance were assigned to the bank as collateral for the extension of credit to the policyholder. Under the terms of the policy, the assignee could exercise any right or privilege at the assignee's option. When the policies were scheduled to automatically convert to ordinary life policies, the insurer failed to deliver the

---

[49]   The additional cases Nationwide cites interpret the laws of jurisdictions other than Florida. See Sorenson v. National Life Ins. Co., 201 N.W.2d 510 (Wis. 1972); Presentation Sisters, Inc. v. Mutual Benefit Life Ins. Co., 189 N.W.2d 452 (S. D. 1971); John Hancock Mut. Life Ins. Co. v. Virginia National Bank, 181 S.E.2d 618 (Va. 1971); Goldheim v. Connecticut Mut. Life Ins. Co., 274 F.2d 752 (D.C. Cir. 1960).

permanent form of life insurance policies to the bank as assignee and instead delivered them to the insured, who promptly declined conversion of the policies. The appellate court noted that the assignee of the policy was placed "in the same status with respect to all rights and liabilities under it which the insured occupied before the transfer." Id. at 466. The relationship of the assignor and assignee was referred to as a substitution of the assignee for the insured. "The legal title actually vests in the assignee subject to a right of redemption by the insured who can accomplish a release of the policy by payment of the principal debt for which the policy is pledged as collateral." Id. at 466.

In Lewis State Bank, urged by Nationwide, no notice of lapse was given to the bank as assignee of a life insurance policy assigned as collateral security for an indebtedness owed to the bank by the insured. The court found that no statute or provision in the assignment or policy required notice of a lapse pending of the policy to either the insured or his assignee. The court articulated the general principle that no duty to notify an assignee of policy lapses exists absent a statute, contract, or conduct of the insurer giving rise to a duty. The case of Massachusetts Mutual also stands for this general rule. Lewis State Bank, 356 So.2d at 1347 (citing Massachusetts Mutual). Lewis State Bank distinguishes Tallahassee Bank on the basis that the assignment there gave the assignee the right to exercise all rights and options under the policy, binding both the insurer and the insured or assignee.

Lewis State Bank and Massachusetts Mutual are distinguishable from this case because they both involved policies and assignments that contained no provisions for notice.  Under Lewis State Bank, the assignee was not entitled to notice because under the terms of either the policy or assignment, there was no provision for notice at all— either to the insured or the assignee.  Lewis State Bank relied on Massachusetts Mutual in invoking the general rule that the insurer owes no duty to notify the assignee when premium payments are due if the policy and assignment do not provide for notice.  The Policy issued to Mr. Ferguson here, unlike those in Lewis State Bank and Massachusetts Mutual, contains a notice provision regarding the start of a grace period for payment of premiums to prevent termination.  Moreover, the issue in Lewis State Bank dealt with an insurer's practice and custom of sending notice to assignees, much like Nationwide's practice.  While Nationwide's practice coincides with the practice in Lewis State Bank, it is irrelevant here because the Policy provides for notice of the start of a grace period within which a specified amount must be paid.

Had Nationwide successfully performed its policy of notifying assignees,[50] it would have been complying by happenstance with the provision of the Policy requiring notice of the grace period.  It is clear that Nationwide attempted to act in accordance with

---

[50]   Mr. Trigg testified to the existence of a written policy of sending notice to assignees of pending lapse and lapsed policies.  Ms. Kelly testified that she would receive a report from which she would identify loans that had been assigned and that the Nationwide policy was to contact assignees of lapsed policies to give them the option to reinstate the policy.

its policy and practice of notifying assignees when a policy is pending lapse or lapsed. On May 24, 2010, Ms. Kelly of Nationwide signed a letter to the assignee, although bearing an incorrect date of February 2008, notifying of a policy lapse.  That the letter was sent in May 2010 is corroborated by Ms. Kelly's note kept in the course of business on May 24, 2010, noting "letter to assignee" regarding the policy lapse.  Unfortunately, the letter was incorrectly addressed and sent to Gold Seal, who was not the assignee of the Policy.  Nationwide's files are devoid of any letter to the Bank notifying of the Policy's pending lapse or lapse.  The only logical conclusion is that Nationwide attempted to give notice to the assignee, but addressed the letter to an entity who was not the assignee, Gold Seal.  There is no evidence whatsoever that Nationwide ever sent notice of the Policy's pending lapse or lapse to the Bank in any capacity.

Finally, Nationwide argues that the phrase in the Assignment making it "subject to the terms and conditions of the policy" restricts notice to the owner only, absent a letter from the owner directing Nationwide to send notice to the assignee.  Nationwide relies on both Massachusetts Mutual and Great West Life Assurance Co. v. Greene, 678 So.2d 385 (Fla.Dist.Ct.App. 1996), both addressing assignments containing this same phrase.  In each case, the assignment placed the assignee in the same status as the owner with respect to the rights and liabilities under the policy.  In Massachusetts Mutual, the same status meant that the policy would lapse and terminate in accordance with the policy for non-payment of premium; however, the court pointed out that there was no notice provision in

-19-

the policy requiring the insurer to give notice to either the owner or the assignee of the

policy.  The phrase in <u>Great West</u> meant that the assignee was bound by the automatic

premium payment provision and could therefore not recover the full proceeds but only

those proceeds after deduction of the premium payments.  Notice was not an issue in

<u>Great West</u>.  Applying these cases to the instant case, the Court finds that the Bank held

the same status as the owner and pursuant to the terms of the Policy, should have received

notice of the start of the grace period at the address submitted in 2009.  The Policy's

notice provision for a grace period, when read together with the Assignment of the rights

and options under the Policy to avoid termination by paying a particular sum before the

end of the grace period, in addition to the assignee Bank's acknowledged designation of

its address in 2009, required Nationwide to give notice to the Bank.

### *The Guaranty*

Gold Seal executed a guaranty of the Rough N'Nuff loan in 2005, two years after

the Assignment of the Policy.  Rough N'Nuff was the borrower on the loan, and the

promissory note did not list any collateral other than the mortgage on the real property.  It

did not list the Policy as collateral, as the Bank had required to be done two years' prior

on the Gold Seal loan for the line of credit.  Both Gold Seal and Rough N'Nuff are the

businesses of the deceased, Mr. Ferguson, and Rough N'Nuff borrowed the money

through a promissory note and the mortgage on the property for the use of Gold Seal's

business.  The issue is whether Gold Seal's guaranty is secured by the Policy according to

the terms of the Assignment, and therefore affords the Bank the right to apply the insurance proceeds to cover the debt of the guaranty.

Looking at the language used in the documents, the Assignment made the Policy collateral security "for any and all present and future liabilities of the above-referenced Borrower, or any of them, to the Assignee, of every nature and kind, whether now existing or that may hereafter arise in the ordinary course of business between any of the above-referenced Borrower and the Assignee." The Borrower denoted in the Assignment is Gold Seal. This clause is commonly referred to as a dragnet clause, or anaconda clause,[51] and these clauses are disfavored and narrowly construed against the drafter. See Uransky v. First Fed. Savings & Loan Ass'n of Fort Myers, 684 F.2d 750, 756 n. 5 (11th Cir. 1982); United States v. American Nat'l Bank, 255 F.2d 504, 507 (5th Cir.), cert. denied, 358 U.S. 835, 79 S.Ct. 58, 3 L.Ed.2d 72 (1958).[52] That the clause is contained in the Assignment and not in a mortgage should not change the interpretation of the dragnet clause. See American Nat'l Bank, 255 F.2d at 509, and generally cases interpreting dragnet clauses in Florida.

---

[51] The clause is labeled "anaconda" because "of its propensity to 'enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate.'" Edrisi v. Sarnoff, 715 So.2d 1124, 1125 n. 2 (Fla.Dist.Ct.App. 1998) (citing United Nat'l Bank v. Tellam, 644 So.2d 97, 98 (Fla.Dist.Ct.App. 1994), which quotes from an Arkansas case).

[52] See also Cabot, Cabot & Forbes Land Trust v. First Nat'l Bank of Fort Walton Beach, 369 So.2d 89 (Fla.Dist.Ct.App. 1979); Boyette v. Carden, 347 So.2d 759, 761 (Fla.Dist.Ct.App. 1977).

Although disfavored, these clauses are generally enforceable if the language of the clause is unambiguous as to the parties' intent to secure future debt.[53] Starlines Int'l Corp. v. Union Planters Bank, N.A., 976 So.2d 1172, 1176 (citing Robert C. Roy Agency, Inc. v. Sun First Nat'l Bank of Palm Beach, 468 So.2d 399 (Fla.Dist.Ct.App. 1985)).[54] Generally, the parties' intent is gleaned from the wording of the documents. See American Nat'l Bank, 255 F.2d at 508. The language of the clause in the Assignment is very clear, and, by its terms, covers future liabilities of only Gold Seal arising in the ordinary course of business between Gold Seal and the Bank. Rough N'Nuff's mortgage is not secured by the Policy according to the terms of the Assignment because only future debts of Gold Seal may be secured by the Policy. Thus, Gold Seal's post-assignment guaranty, not the Rough N'Nuff mortgage, constitutes a future liability under the language of Assignment.

In conjunction with analyzing the language to discern the parties' intent, Florida courts often address the circumstances and nature of both the initial transaction and subsequent-acquired debt in reaching their decisions. While not an easily-applied test,

---

[53]  In Florida, with respect to securing pre-existing debt, courts have ruled both ways in that the debt has sometimes been required to be specifically identified by name in the mortgage, see Tellam, and conversely, has not been required to be identified. See Robert C. Roy Agency, Inc. v. Sun First Nat'l Bank of Palm Beach, 468 So.2d 399 (Fla.Dist.Ct.App.) (holding the bank, in the default of a residential loan, could retain possession of coin collection pledged as collateral for loans obtained subsequent to residential loan), review denied, 480 So.2d 1295 (Fla. 1985).

[54]  See also In re Continental Country Club, Inc., 108 B.R. 327, 332 (Bankr. M.D. Fla. 1989).

more recent opinions hold that a dragnet clause will cover future liabilities only if the subsequent indebtedness refers back to the dragnet clause as providing security for that advance, or "when the obligations relate to the same transaction or are of the same kind or class."  Garrote v. Ocean Bank, 713 So.2d 1095, 1097 (Fla.Dist.Ct.App. 1998).  Applying the test to this case, the first prong is not met because neither the mortgage nor the guaranty identify the Policy as security through the prior Assignment.  The second prong is more difficult to employ.

Obviously, the obligation of the Gold Seal loan of 2003 is not the same transaction as the mortgage transaction of 2005.  Whether the two transactions are "of the same kind or class" is more complicated.  An example of a subsequent obligation that is not within the same kind or class, occurs almost always where a home mortgage contains a dragnet clause, and homeowners later incur a debt unrelated to their home.   In a case where the homeowners later guaranteed business loans, the latter transactions were not considered "similar in character" to the residential mortgage, particularly when the subsequent guaranties did not identify or reference that they would be secured by the prior mortgage, and the court held that the parties did not intend for the home to secure the subsequently given guaranty of a business loan.  See Garrote.  Nothing in the record in this case, however, indicates that Rough N'Nuff's property, or the Gold Seal loan, was used for anything other than commercial purposes, evidencing the guaranty as commercial in nature.  In short, both the Gold Seal loan secured by the Policy and the subsequent

mortgage of the property by Rough N'Nuff were commercial transactions of Mr.

Ferguson's businesses, and hence, the equitable considerations of protecting innocent

consumers do not direct an unmistakable decision.

The Bank relies predominantly on Silva v. Exchange Nat'l Bank of Tampa, 56

So.2d 332 (Fla. 1951). Mr. Silva assigned his life insurance policies to a bank of which

he had been a customer for years. The assignment contained a dragnet clause. Over the

years, Mr. Silva was the endorser of many notes held by the bank. Upon his death, the

bank collected the proceeds from his life insurance policies and applied them to his debt

on the notes and on various checks he had endorsed and received money for which no

funds were available. Just before his suicide, in a letter he wrote to his attorney and

another he wrote to a teller, he said he was leaving the life insurance policies he had

assigned to the bank as collateral for the many loans for the purpose of satisfying his debt

to the bank. The Florida Supreme Court commented that the letters evidenced "an

intention that these assignments of life insurance proceeds were to cover all indebtedness

due the bank in the past, present, or future, arising in the ordinary course of business."

Silva, 56 So. 2d at 336.

Mr. Ferguson, like Mr. Silva, had a business relationship with his bank. Mr.

Ferguson's companies, Gold Seal and Rough N'Nuff, were the makers of promissory

notes and even a mortgage in the case of Rough N'Nuff. Mr. Ferguson personally

assigned his life insurance policy to secure the promissory notes of Gold Seal held by the

Bank.  When Rough N'Nuff mortgaged the property of the roofing business, both Gold

Seal and Mr. Ferguson signed unconditional guaranties of the promissory note of Rough

N'Nuff held by the Bank.  The guaranty of Gold Seal falls squarely within the language

of the Assignment as a future liability of Gold Seal and is therefore secured by the Policy.

The record is devoid of any evidence other than the documents that would further reveal a

contrary intent on the part of Gold Seal.[55]  The main difference between <u>Silva</u> and this

case is that the decedent, Mr. Ferguson, did not write letters indicating that he knew the

Policy would be used to pay the future debts of Gold Seal.

     The record reveals that the Gold Seal loan is a similar transaction to Gold Seal's

guaranty of Rough N'Nuff's note in that they are both commercial transactions

undertaken in the ordinary course of business of Mr. Ferguson's companies with the

Bank.  Based on this finding, any further evidence is unnecessary to ruling on this

summary judgment, and no genuine issue of material fact exists on the record.

     It is therefore **ORDERED AND ADJUDGED** as follows:

---

[55]  The evidence submitted regarding the Bank's ability to cross-collateralize the loan and the mortgage and the Bank's practice of identifying all collateral security in a mortgage or a loan does not assist this Court in determining whether the parties intended or knew that the guaranty, as a future liability of Gold Seal, would be secured by the Policy.  It is apparent that the Bank intended the guaranty to be secured because of the existence of the dragnet clause in the Assignment.  Whether Mr. Ferguson's intended that the Policy be used as security for any future liability of Gold Seal must be found in the document itself, absent any persuasive circumstances to the contrary.

(1)     Defendant Nationwide Life Insurance Company's Motion for Summary

Judgment (Dkt. 42) is **DENIED**.  The Court reserves ruling on damages,

including entitlement to attorney's fees, interest and costs.

(2)     Plaintiff Pilot Bank's Motion for Summary Judgment (Dkt. 45) is

**GRANTED** excepting the amount of damages.

(3)     This case shall proceed to trial on the issue of damages.

**DONE AND ORDERED** at Tampa, Florida, on July 29, 2013.


　　　　s/*Richard A. Lazzara*　　　　　　　　
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record